WILLIAMS, J.
In this workers' compensation case, the claimant, Sadeq Elmuflihi, appeals a summary judgment in favor of the defendant, Central Oil & Supply Corporation, and the denial of his motion for partial summary judgment. The claimant also appeals the award of weekly workers' compensation benefits in the amount of $208.33. The defendant, Northside Stores, LLC, has answered the appeal, contesting the finding that the claimant was injured in the course *158 and scope of his employment. For the following reasons, we affirm.
FACTS
The claimant, Sadeq Elmuflihi, was employed as a cashier at a convenience store in Monroe, Louisiana. The defendant, Northside Shores, LLC ("Northside"), owned the store;[1] the defendant, Central Oil & Supply Corporation ("Central Oil"), owned the premises and leased them to Northside. Central Oil, which is in the business of distributing and supplying fuel throughout the United States, also supplied oil and gasoline to Northside's convenience store pursuant to a consignment agreement.
On July 16, 2014, the claimant and another employee, Larry Briggs, closed the convenience store at 11:00 p.m. The claimant provided Briggs with a ride home, as was their usual routine. The claimant locked the door to the store from the outside and he and Briggs entered his vehicle, which was parked in front of the store. As the claimant attempted to drive away from the store, an unknown assailant approached the vehicle and began to fire a gun at the vehicle. The claimant suffered a gunshot wound to the neck and was rendered unconscious; the vehicle came to a stop after it struck a nearby residence.[2] The claimant was severely injured and his medical records indicate that he continues to exhibit marked weakness in his arms and legs.[3] Northside was uninsured at the time of the incident.
On October 15, 2014, the claimant filed a disputed claim for workers' compensation, naming "Central Oil & Supply Corp., d/b/a Hardy Mart" as his employer.[4] The claimant alleged that he was entitled to "benefits for permanent, total disability due, alternatively TTDs or SEBs, with medical benefits, penalties, attorney fees, legal interest and all costs[.]" Central Oil answered the petition, asserting that it was not the claimant's employer and that the claimant was not injured in the course and scope of his employment.
On January 12, 2015, the claimant filed a supplemental and amending petition, alleging that Northside was his direct employer and that Northside was "liable, in solido, with the statutory employer." More specifically, the claimant alleged Northside and Central Oil were engaged in a joint venture by virtue of the lease and consignment agreements, and both entities were liable to him for workers' compensation benefits. Northside answered the petition, admitting that the claimant was its employee. However, Northside contended the claimant was not injured in the course and scope of his employment.
Subsequently, the claimant filed a motion for partial summary judgment, seeking a judgment declaring Central Oil and Northside liable to him for workers' compensation benefits. He argued that his duties as a cashier required him to manage the sales of gasoline for Central Oil, which was engaged in a joint venture with Northside. According to the claimant, since Northside (the direct employer) was uninsured *159 at the time of the incident, Central Oil was liable to him for workers' compensation benefits.
Thereafter, Central Oil filed a motion for summary judgment, arguing that it was not engaged in a joint venture with Northside. In support of its motion, Central Oil attached the following exhibits: a copy of the lease agreement between it and Northside; a copy of the consignment agreement between it and Northside; the affidavit of its president, Hardeman Cordell, in which Cordell denied the existence of a joint venture; and excerpts from the deposition of Khaled Nagi, Northside's representative, in which Nagi testified that Northside and Central Oil were not involved in a partnership or joint venture.
The WCJ denied the claimant's motion for partial summary judgment and granted summary judgment in favor of Central Oil. The WCJ stated, "[A]lthough I do find that the consignment agreement is very detailed, I am unable to find that a combination of the contract of lease and the consignment agreement equates to a joint venture." The WCJ dismissed Central Oil from the proceedings.[5]
The claimant proceeded to trial with Northside as the remaining defendant. Following the trial, the WCJ concluded that the claimant was injured in the course and scope of his employment. The WCJ stated:
* * *
At the time immediately preceding the shooting, claimant and his coworker, Mr. Briggs, were in the process of completing a close-out procedure on behalf of defendant. It is reasonable for claimant to be considered "in the act of leaving" during this close-out procedure. Thereafter claimant locked and secured the premises of defendant. It is also reasonable for claimant to be considered "in the act of leaving" during that process. Furthermore, claimant entered his vehicle and was leaving the parking lot of defendant when he was shot. He was both literally and jurisprudentially "in the act of leaving" at the time he sustained injury. Inasmuch as he was in the act of leaving, he's entitled to "a reasonable period" while still on the employer's premises and he must be regarded as being within the course and scope of employment.
Defendants failed to present evidence that the shooting arose out of a dispute with another person over matters unrelated to the employment. According to Detective Kent, the assailant was never apprehended and the motive for the shooting was never discovered.
* * *
The WCJ concluded that the claimant was entitled to the "payment of all medical expenses related to his work related injury, including treatment received in the state of California." Initially, the WCJ awarded temporary total disability benefits in the amount of $312.50 per week from July 14, 2014, to August 4, 2016. The WCJ also awarded supplemental earnings benefits "in the same amount from August 4, 2016 and continuing in accordance with law." Further, the WCJ awarded penalties in the amount of $4,000 and attorney fees in the amount of $5,000. Thereafter, the WCJ amended the judgment to reduce the amount of weekly benefits to $208.33.[6]
*160 The claimant appeals. Northside has answered the appeal.
DISCUSSION
The claimant contends the WCJ erred in granting summary judgment in favor of Central Oil and denying his motion for partial summary judgment. He argues that the evidence established that Northside and Central Oil were engaged in a joint venture. The claimant also argues that the terms of the consignment agreement reveal that a joint venture existed for the following reasons: Northside's employees were responsible for selling Central Oil's oil and gasoline products; the store operated under the name "Hardy Mart"; Central Oil retained the right to determine the price of the gasoline and the obligation to maintain the gasoline pumps; Northside was required to operate during certain hours; Northside's employees were required to wear certain uniforms; Northside received a share of the profits derived from the sale of gasoline; Northside's employees were required to read the gas meters to determine the amount of gasoline sold and to provide a daily report of the sales; and Northside's employees were responsible for changing the signage to reflect the cost of gasoline when instructed to do so by Central Oil.
At the time the instant lawsuit was filed, La. C.C.P. art. 966(B)(2) provided, in pertinent part:
[A motion for summary judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, admitted for purposes of the motion for summary judgment, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law[.]
Appellate courts review summary judgments de novo, using the same criteria that govern the trial court's consideration of whether summary judgment is appropriate. Garrison v. State Farm Fire & Cas. Co. , 51,245 (La. App. 2 Cir. 4/5/17), 217 So.3d 586 ; Argonaut Great Central Ins. Co. v. Hammett , 44,308 (La. App. 2 Cir. 6/3/09), 13 So.3d 1209, writ denied , 2009-1491 (La. 10/2/09), 18 So.3d 122.
The law regarding the formation of a joint venture has been summarized as follows:
A joint venture results from the undertaking by two or more persons to combine their efforts, knowledge, property or labor to engage in and carry out a single business venture for joint profit. A joint venture is analogous to a partnership and controlled largely by the rules applicable to partnerships. There must be a sharing of the profits and losses with each party having some right of control over the business. The existence or nonexistence of a joint venture is a question of fact and each case must be considered according to its circumstances.
* * *
No formal or specific agreement is required. Generally, the relationship may be formed by an oral agreement and the existence of a joint venture may be inferred from the conduct of the parties and other circumstances.
Riddle v. Simmons , 589 So.2d 89, 92 (La. App. 2 Cir. 1991), writ denied , 592 So.2d 1316 (La. 1992). Joint ventures arise only where the parties intended the relationship to exist, and they are ultimately predicated *161 upon contract either express or implied. Broadmoor, L.L.C. v. Ernest N. MorialNew Orleans Exhibition Hall Auth. , 2004-0211 (La. 3/18/04), 867 So.2d 651.
In the instant case, the "Contract of Lease" between Northside and Central Oil provided, in pertinent part:
* * *
[Central Oil] shall retain and be entitled to a portion of the revenue derived from the sale of gasoline as proscribed in the gasoline consignment agreement and shall not be required to compensate [Northside] for any portion of the leased premises used for sale of gasoline.
[Central Oil] shall be responsible only for repairs to the roof, structural members, or foundation of the building situated on the leased premises in addition to all repairs associated with the canopy and exterior signage used for the sale of gasoline, but shall not be responsible for any other repairs which may be due on the leased premises. All maintenance and repairs of any kind and nature which may be due to the improvements situated on the leased premises shall be made at the expense of [Northside], and [Central Oil] shall have no obligation to make any repairs whatsoever to the leased premises except to those portions above stated.
[Northside] shall also maintain at its expense owner's, Lessor, and Lessee liability insurance covering the contents of the building, together with liability insurance to protect [Central Oil and Northside] from liability to employees of [Northside] and/or third persons. * * * Certificates of all insurance coverage shall be furnished by [Northside] to [Central Oil].
* * *
[Central Oil] shall not at any time or to any extent whatsoever be liable, responsible, or in any way accountable for any injury to or death of persons or loss, destruction, or damaged property, including property and employees of [Northside], occurring in, on, or about the leased premises, or wherever occurring, resulting from any use of or activities on the leased premises, whether such injury, death or loss, destruction or damage shall be caused or in any way result from or arise out of any act, omission, or negligence of [Northside] or of any occupant, sublessee, visitor, or user of any portion of the leased premises, or shall result from or be caused by any other matter or thing, whether of the same kind or of a different kind than the matters or things above set forth and [Northside] shall forever indemnify [Central Oil] against any and all claims, liability, loss, damage, actions, or causes of action whatsoever on account of any such injury, death, loss, destruction, or damage and any related expense, including attorney's fees.
* * *
[Northside] agrees to adhere to all standards set by marketers of oil and gas or any other product sold on the leased premises and /or distributed by [Central Oil] and shall require that employees [wear] uniforms as required by the aforesaid marketers. Furthermore, [Northside] acknowledges receipt of the Site Checklist * * * which is used [to] evaluate the leased premises and hereby agrees to conform with the standards and criteria[.]
* * *
Leased premises shall be open for business a minimum of 6:00 A.M. to 10:00 P.M. Sunday through Thursday and 6:00 A.M. to 11:00 P.M. Friday and Saturday[.]
The record also shows that Central Oil and Northside entered into a consignment *162 agreement whereby Central Oil would "deliver Motor Fuels to [Northside] for sale to the motoring public at [the convenience store]." The consignment agreement contained the following specific provisions:
* * *
5. PRICE: [Central Oil] shall establish the price at which its Motor Fuel is sold to the public and [Northside] agrees to promptly price said Motor Fuels on the dispensers and at the premises in accordance with the instructions of [Central Oil], which instructions may be oral or in writing. [Central Oil] on Monday and Thursday of each calendar week shall be permitted to remove the gross proceeds minus any commission due to [Northside] received from the sale of [Central Oil's] Motor Fuel from an account established by [Northside]. * * * [Central Oil and Northside] agree to share equally any transaction charges incurred for the purchase of Motor Fuel. * * *
6. COMMISSION: [Central Oil] and [Northside] agree that [Northside] will be paid a commission on sales of Motor Fuels. The commission due to [Northside] is one-half (1/2) the profit on the sale of the Motor Fuel. Profit shall be the difference between the street price or price in which the Motor Fuel is sold to the public and the delivered price which includes all expenses and charges including but not limited to transportation charges and taxes.[7]
* * *
8. RELATIONSHIP OF PARTIES: It is expressly agreed that [Northside] is not the employee of [Central Oil]. Further, IT IS EXPRESSLY UNDERSTOOD THAT AS [CENTRAL OIL'S] AGENT SELLING FOR [CENTRAL OIL'S] ACCOUNT, [NORTHSIDE] DOES NOT HAVE THE RIGHTS OF A "FRANCHISEE" UNDER THE FEDERAL PETROLEUM MARKETING PRACTICES ACT * * * OR ANY SIMILAR STATE OR FEDERAL STATUTE.
* * *
(Emphasis in original).
As stated above, Cordell's affidavit was admitted into evidence in support of the motion for summary judgment. In his affidavit, Cordell described Northside as "an independent convenience store" that was "independently operated by Northside." He specifically denied entering into an agreement to create a joint venture with Northside and averred as follows:
* * *
25. Northside Stores, LLC does not share in the profits of any facet of the operations of Central Oil.
26. There is no relationship or enterprise between Central Oil and Northside outside of the Contract of Lease for the property itself and Northside's agreement to collect payments for fuel supplied on consignment and sold onsite.
27. There is no provision in the Contract of Lease recognizing employees of Northside as statutory employees of Central Oil.
28. There is no provision in the Gasoline Consignment Agreement regarding statutory employment and no negotiation regarding statutory employment as a condition of the Gasoline Consignment Agreement.
29. [The claimant] is not, and has never been, an employee of Central Oil[.]
*163 30. [Central Oil] and [Northside] did not contemplate, intend to, or in fact, operate as a partnership or joint venture.
31. In the convenience store industry, it is standard practice for merchants to be supplied with goods on consignment, including fuel, food products, novelty products, and beverages.
* * *
Khaled Nagi provided deposition testimony as Northside's corporate representative.[8] Nagi testified as follows: the name of the store was "Northside"; however, the name, "Harde Mart," appeared on the store's sign; Adel Nagi began operating the store less than two months before the shooting occurred and had not changed the sign; the claimant had been employed by the previous owner of the store; when Northside began operating the store, the claimant was retained as a part-time employee; the store's hours of operation were from 7:00 a.m. until 11:00 p.m. every day; all money was left in the store overnight; the claimant was not responsible for taking money to the bank; Northside employees were responsible for accepting payments for gasoline and would call Central Oil if they experienced problems with the gas pumps; Northside did not perform any repairs on the gas pumps; Northside employees who worked the morning shift were responsible for reading the gas meters and documenting the amount of gas sold every day; and Northside was not engaged in a partnership with Central Oil.
We have reviewed the summary judgment record in its entirety. There is nothing in the record to support the claimant's contention that Northside and Central Oil were engaged in a joint venture. The summary judgment evidence established that Central Oil and Northside were two separate and distinct entities that entered into a standard commercial lease and a standard agreement to sell gasoline pursuant to a consignment agreement. Northside utilized a building with underground gas tanks, pumps and equipment that were owned by Central Oil. Northside did not have the authority to determine the price of the fuel and was paid a percentage of the profits pursuant to the consignment agreement. Northside's corporate representative admitted that Northside did not know how much fuel was sold. He stated, "[W]e sell it to [customers] and we just make a penny of [sic] off that gallon and that's it. We don't know anything about profit, we don't know anything about the gas." The representative also stated that Northside cashiers were only responsible for "ring[ing] the gasoline" and collecting the payments from customers. We find no error in the WCJ's finding that the claimant failed to prove that a joint venture between Northside and Central Oil existed. Consequently, we find that the WCJ did not err in granting summary judgment in favor of Central Oil and denying the claimant's motion for partial summary judgment. This assignment lacks merit.
The claimant also contends the WCJ erred in failing to conclude that his average weekly wage was $700. He argues that the evidence established that he worked from 1:00 p.m. until 11:00 p.m., 7 days per week, and that he was paid $700 per week in cash. Therefore, according to the claimant, his weekly indemnity benefits should have been based on that amount. Further, the claimant argues that at the very least, the WCJ should have utilized the legally *164 required minimum wage to calculate his wages.
An employee is entitled to workers' compensation benefits if he "receives personal injury by accident arising out of and in the course of his employment." La. R.S. 23:1031(A). Factual findings in workers' compensation cases are subject to the manifest error rule. Buxton v. Iowa Police Dept. , 2009-0520 (La. 10/20/09), 23 So.3d 275 ; Crawford v. Town of Grambling , 51,090 (La. App. 2 Cir. 1/11/17), 211 So.3d 660, writ denied , 2017-0284 (La. 4/7/17), 218 So.3d 110. Under this rule, the reviewing court does not decide whether the WCJ was right or wrong, but only whether its findings are reasonable. Id. When there are two permissible views of the evidence, the WCJ's choice between them can never be manifestly erroneous or clearly wrong. Id. The reviewing court is emphatically not permitted to reweigh the evidence or reach its own factual conclusions from the record. Marange v. Custom Metal Fabricators, Inc. , 2011-2678 (La. 7/2/12), 93 So.3d 1253 ; Crawford , supra .
As stated above, the claimant testified that he was paid $700 per week in cash. Conversely, Northside maintained that the claimant was paid $200 per week in cash, and he received an additional $450 per month for food and rental assistance. Northside submitted the claimant's W2 form, which showed that the claimant earned $1,600 from June 2014, when Northside began operating the convenience store, until he was injured on July 16, 2014. In the reasons for judgment, the WCJ stated, "Based on the documents offered and admitted into the record, claimant's average weekly wage was found to be three hundred twelve dollars and fifty cent[s] ($312.50)."
The claimant did not present any evidence to support his testimony that he earned wages in the amount of $700 per week. It is clear from the record that the WCJ found credible the testimony of Northside's corporate representative, who testified that the claimant was paid $200 per week in cash, $250 per month toward rent and $200 per month toward food. Based on this record, we find that the WCJ was not manifestly erroneous in concluding that the claimant's average weekly wage was $312.50, and that he was entitled to weekly benefits in the amount of $208.33. This assignment lacks merit.
Further, the claimant contends the WCJ erred in failing to award the correct amount in indemnity benefits. He argues that, pursuant to La. R.S. 23:1171.2, the amount of weekly compensation should have been increased by 50 percent because of Northside's failure to obtain workers' compensation insurance.[9]
It is undisputed that Northside did not have workers' compensation insurance in effect at the time of the claimant's injury. However, the record reveals that the claimant did not raise this issue in the lower court. In fact, during the trial and in his post-trial brief, the claimant specifically *165 argued, "[T]he average weekly wage in this case should be $700 and the workers' compensation indemnity rate should be two-thirds of that which amounts to $466.67." Consequently, the WCJ did not consider the applicability of 23:1171.2. Because the issue was not raised in the lower court, this Court will not consider it for the first time on appeal. See , Segura v. Frank , 1993-1271, 1993-1401 (La. 1/14/94), 630 So.2d 714 ; Politz v. Politz , 49,242 (La. App. 2 Cir. 9/10/14), 149 So.3d 805 ; Cooper v. Southern Hunting Products, Ltd. , 39,166 (La. App. 2 Cir. 12/22/04), 891 So.2d 91.
Answer to Appeal
By answer to this appeal, Northside contends the WCJ erred in finding that the claimant's accident arose during the course and scope of his employment. Northside argues that the claimant was injured in the parking lot of the convenience store, after he completed his shift, locked the store, entered his personal vehicle and started to drive away. Further, Northside argues that the video recording of the shooting reveals that robbery was not the apparent motive for the shooting because the unknown assailants did not approach the claimant's vehicle.
To establish entitlement to workers' compensation benefits, a claimant must show that he sustained a personal injury by an accident arising out of and in the course of his employment. La. R.S. 23:1031(A) ; Buxton , supra ; Maxwell v. Care Solutions, Inc. , 50,088 (La. App. 2 Cir. 9/30/15), 179 So.3d 650, writ denied , 2015-1954 (La. 11/30/15), 184 So.3d 36. The two requirements of arising out of employment and in the course of employment are separate but mutually interdependent concepts used to determine whether the injury is sufficiently related to the employment to warrant coverage under the system of workers' compensation. Mundy v. Dept. of Health & Human Res. , 593 So.2d 346 (La. 1992) ; Maxwell , supra . However, these requirements should not be considered in isolation, and a strong showing of one can overcome or strengthen a weaker showing of the other. Maxwell , supra ; Mitchell v. Brookshire Grocery Co. , 26,755 (La. App. 2 Cir. 4/5/95), 653 So.2d 202, writ denied , 1995-1115 (La. 6/16/95), 655 So.2d 339.
An accident occurs in the course of employment when the employee sustains an injury while actively engaged in the performance of his duties during working hours, either on the employer's premises or at other places where employment activities take the employee. Mundy , supra ; Maxwell , supra . The principal criteria for determining course of employment are time, place and activity. Id. Even if an employee has finished his day's work and is in the act of leaving, he is entitled to a reasonable period while still on the employer's premises which is regarded as within the course of employment; the working day embraces these intervals just as it embraces reasonable periods of rest, relaxation, and attendance to personal needs. Mitchell , supra ; Duncan v. South Central Bell Tel. Co. , 608 So.2d 649 (La. App. 2 Cir. 1992), writ denied , 610 So.2d 800 (La. 1993). As stated above, factual findings in workers' compensation cases are subject to the manifest error rule. Buxton , supra ; Crawford , supra .
In Mitchell , supra , the claimant worked as a cashier at a grocery store. After the claimant completed her shift and clocked out, she purchased some grocery items prior to leaving the store. She fell in the parking lot as she was walking to her car. This Court found that the accident occurred in the course of and arose out of her employment. We stated:
[I]n looking at the time, place, and activity at the time of the accident, we note *166 that it was after Mitchell's shift ended, she was still on the employer's premises, and she was walking to her car to go home.
Our jurisprudence had been inclined toward coverage of injuries on the employer's premises within a reasonable time after the completion of the employee's work day.
Id. at 205.
In Maxwell , supra , the claimant was employed as a caregiver who provided care to clients in their homes. The claimant completed her shift at 5:00 p.m.; however, before she left her client's home, he began to complain of chest pain. The claimant called her employer; a nurse on the employer's staff instructed the claimant to call 9-1-1, accompany the client to the hospital and remain with him until he was either discharged from the emergency room or admitted to the hospital. Per the instructions, the claimant followed the ambulance to the hospital in her personal vehicle. The claimant remained with the client for several hours, until a decision was made to admit him to the hospital. As she was walking to her vehicle, at approximately 10:00 p.m., the claimant was attacked in the hospital parking lot by an unknown assailant. This court found that the injury occurred in the course of and arose out of her employment. We stated:
Ms. Maxwell was on the hospital's premises specifically engaged in duties (or having just completed them) under instructions from a nurse on defendant's staff. Furthermore, it is irrelevant that claimant may have been finishing her shift or even "off the clock" when she went to the hospital with her client. The critical fact is that she did so because she was instructed to do so by a staff member of Care Solutions. Further following her instructions, as soon as the client Ms. Maxwell had been caring for that day had been admitted to the hospital, claimant left him, and it was as she was walking to her vehicle in the hospital parking lot that she was the victim of a vicious attack by an unknown assailant. Unquestionably, claimant was in the course of her employment with defendant when she sustained her injuries.
Id. at 656-657.
In the instant case, the claimant had just completed his shift. He immediately closed and locked the door to the convenience store and proceeded to his vehicle. The claimant was in the act of leaving his employer's premises when he was shot by an unknown assailant. We find no error in the WCJ's finding that the claimant was injured in the course of his employment.
An accident arises out of employment if the conditions or obligations of the employment caused the employee in the course of his employment to be at the place of the accident at the time the accident occurred. When an employee is squarely within the course of his employment, virtually any risk has been considered arising out of employment. Mundy , supra ; Maxwell , supra . An injury by accident should not be considered as having arisen out of employment if the employer can establish that the injury arose out of a dispute with another person or employee over matters unrelated to the injured employee's employment. La. R.S. 23:1031(E).
In this case, the claimant was an employee of a convenience store. He testified that his normal workday was from 1:00 p.m. until 11:00 p.m. On the night he was injured, he closed the store at 11:00 p.m., per his usual routine. The claimant sustained significant injuries as a result of being shot by an unknown assailant, on his employer's premises, as he was leaving to go home. We find that the WCJ did not *167 err in finding that the claimant's injuries occurred in the course of and arose out of his employment with Northside.
Additionally, Detective Kent, of the Monroe Police Department, testified that the shooter was never apprehended and the motive for the shooting was unknown. Consequently, we find that the WCJ did not err in finding that Northside failed to meet its burden of proving that the claimant's injuries "arose out of a dispute with another person or employee over matters unrelated to the injured employee's employment."
CONCLUSION
For the foregoing reasons, we hereby affirm the grant of summary judgment in favor of the defendant, Central Oil & Supply Corporation, and we affirm the denial of the claimant's motion for partial summary judgment. We also affirm the WCJ's finding that the claimant was injured in the course and scope of his employment and the award of weekly benefits in the amount of $208.33. Costs of this appeal are assessed to the employer, Northside Stores, LLC.
AFFIRMED.

Northside was owned by Adel Nagi.

The events from that night were captured and recorded by the convenience store's video surveillance system. The recording was entered into evidence during the trial. Detective Jeremy Kent, of the Monroe Police Department, testified that the shooter was never apprehended.

The claimant testified that he was in a coma for several weeks and he does not remember the shooting.

In some portions of the record, "Hardy Mart" is spelled "Harde Mart."

The claimant filed an appeal of that ruling. This Court dismissed the appeal, finding that the judgment was not an immediately appealable final judgment. Elmuflihi v. Central Oil & Supply Corp. d/b/a Hardy Mart , 50,850 (La. App. 2 Cir. 3/17/16) (unpublished).

After the proposed judgment was submitted to counsel for Northside, counsel wrote a letter to the WCJ, stating, "The court found the [average weekly wage] to be $312.50. However, the court then awarded TTD and SEBs at the same rate. The rate should be $208.33."

During the corporate deposition, Khaled Nagi testified that Northside did not receive one-half of the profits from the sale of gasoline. He stated that Northside received a commission in the amount of one cent per gallon of fuel sold.

Khaled Nagi is the brother of Northside's owner, Adel Nagi, who was also present at the deposition. Adel Nagi did not testify because he "doesn't speak a lot of English." Khaled Nagi testified that he owned his own convenience store but he did not have any ownership interest in Northside.

An employer shall secure compensation to his employees (1) by insuring and keeping insured the payment of such compensation with an authorized workers' compensation insurer, (2) by using any combination of life, accident, health, property, casualty, or other insurance policies offered by authorized insurers, or (3) by furnishing the satisfactory proof of the employer's financial ability to pay such compensation. La. R.S. 23:1168(A) ; Hurt v. Superior Cable Installation, Inc. , 1999-2982 (La. App. 1 Cir. 5/12/00), 762 So.2d 705, writ not cons. , 2000-1950 (La. 9/29/00), 769 So.2d 549. Where an employer has failed to provide security for compensation as required by La. R.S. 1168, the amount of weekly compensation provided by the workers' compensation statutes shall be increased by 50 percent. La. R.S. 23:1171.2.